LAW OFFICES OF PETER C. CHEN
Peter C. Chen, Esq. (SB # 222639)
901 Corporate Center Drive
Suite 500
Monterey Park, CA 91754
Telephone:    (323)264-2588
Facsimile:    (323)269-1818
Email:    PChen@lawyer.com

Attorney for Plaintiff
CARLOS DUARTE

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARLOS DUARTE, an individual;<br><br>Plaintiff,<br><br>vs.<br><br>STRYKER SALES CORPORATION, a Michigan corporation registered and conducting business in California, and DOES 1 through 10 inclusive,<br><br>Defendants. | Case No.:  2:16-cv-37<br><br>COMPLAINT FOR:<br><br>1.  Wrongful Termination<br>2.  Harassment and Hostile Work Environment<br>3.  Breach of Employment Contract<br>4.  Breach of Implied Covenant of Good Faith and Fair Dealing<br>5.  Intentional Infliction of Emotional Distress<br>6.  Negligent Infliction of Emotion Distress<br><br>Jury Trial Demanded |

Plaintiff CARLOS DUARTE, for his causes of action against Defendants, STRYKER SALES CORPORATION and DOES 1 through 10 inclusive, alleges as follows:

- 1 -
COMPLAINT

## PARTIES

1. Plaintiff Carlos Duarte ("Plaintiff" or "Duarte") is a male adult residing in the County of Los Angeles. Plaintiff is a citizen of the State of California.

2. Defendant Stryker Sales Corporation ("Stryker") is a Michigan corporation with its principal place of business and headquarters in Kalamazoo, Michigan. Stryker is registered and conducts business in State of California, including but not limited to the county of Los Angeles.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1332. This is an action involving questions arising from laws of the United States and disputes between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interests and costs.

4. Venue is proper under 28 U.S.C. § 1391 (b) (and (c) because California Central District is the judicial district in which a substantial part of the events or omissions giving rise to the claims occurred; and where defendant is subject to the court's personal jurisdiction.

## BACKGROUND FACTS

5. Plaintiff is a Latino male over 40 years of age who began working for Stryker on or about April 16, 2006 as a salesperson in the Endoscopy division of Stryker (which is located in San Jose, California). Plaintiff was stationed and/or based his work out of Los Angeles County, California.

6. Plaintiff made an immediate impact as outstanding salesperson and earned repeated accolades for his work performance. In 2006, Plaintiff individually achieved 200% capital growth in sales revenue and exceeded his required sales quota by substantial amounts.

7. In 2007, Plaintiff achieved $1.75 million in sales revenue and was recognized as the most creative and ingenious sales person in his sales region.

COMPLAINT

8. In 2008, Plaintiff achieved $2.5 million in sales revenue, which again greatly exceeded his sales quota.

9. In 2009, Plaintiff was appointed as "Anchor Trainor" for the Urology line where he was responsible for growing sales in Laparoscopy, Urology, Gynecology, and Arthroscopy.

10. In 2010, Plaintiff individually achieved 147% capital growth with $4.16 million in sales revenue. Based on the excellence of the entirety of his work, Plaintiff was nominated for Stryker Representative of the year for the entire company. Plaintiff was named the MVP for the west region by Stryker and awarded a Rolex watch to mark his achievements.

11. In 2011, Plaintiff was promoted to management where he served as West Regional Manager for the Surgical Division of Stryker. Plaintiff led his team to exceed sales goals with total sales revenue of $49 million dollars. All eleven members of the regional sales team achieved or exceeded sales quota – the first time such accomplishment was reached at Stryker in many years. He was given a "Highly Effective" performance evaluation for attaining sales quotas and complying with corporate policies, code of conduct, and complaint handling. Stryker noted team engagement as Plaintiff's biggest strength and acknowledged Plaintiff for "great job bringing this group together and creating team environment." Stryker further noted that Plaintiff "has character, integrity, honor, and leads by example."

12. In 2012, Plaintiff again led his team to exceed sales goals with total sales revenue of $53 million and total growth of 20% - the second highest growth in the division. All members of his sales team reached or exceeded sales quota for the second straight year – a rare achievement in the history of the company. He was given a "Highly Effective" performance evaluation for team engagement and demonstrated leadership. Stryker noted that Plaintiff "has taken this team very far", created a "real team environment" and that he "has an opportunity to not only lead his team but be a

true leader amongst his peers."

13. In 2013, Plaintiff again led his team to exceed sales growth with a total growth rate of 16% and total sales revenue of $47 million – the second highest in the company. All eleven sales representatives under his supervision exceed sales quota. He was given an "Outstanding" rating in performance evaluation for attaining sales quotas and "Highly Effective" performance evaluation for talent management. Stryker noted Plaintiff for "great job making sure his team was engaged with him and the region. He set up activities that were great team building events."

14. From 2011 to 2014, Plaintiff served as Regional Manager and was awarded substantial performance bonus for his work. At all relevant times, Plaintiff was evaluated as being at least "consistently effective", "highly effective" or better in his job performance.

15. On December 16, 2014, Plaintiff was summoned to a meeting with Stryker's human resources manager, Erik Berg, who informed Plaintiff that Plaintiff was accused of starting a competing business. Plaintiff responded that he did not and was not starting a company to compete with Stryker and that he loved the Company. Plaintiff asked for proof or any evidence of the accusation against him. Stryker did not provide any proof or evidence.

16. Plaintiff was informed by telephone on December 17, 2015, that he was terminated from Stryker, with a retroactive termination date of December 16, 2015, by his supervisor, Erik Masingale, and human resources manager, Erik Berg.

17. A few days later, Plaintiff received written notification that his wrongful termination was moved back to become effective on December 22, 2014. The notification did not provide reasons for his termination.

18. Then in 2015, Stryker notifies Plaintiff in writing that he was terminated based on four reasons, including allegations that Plaintiff started a company in competition of Stryker, recruited

Stryker employees, vendors, and/or contractors and contacted Stryker supplier in China. All of the four reasons given by Stryker were false and pretext to wrongful and discriminatory termination and breach of employment agreement.

19. Plaintiff was replaced at Stryker by a White sales representative that Plaintiff trained. Plaintiff's supervisor and human resources manager were also White.

20. At the time of his wrongful termination, Plaintiff was the West Region Surgical Sales Manager with a total annual compensation of $330,000 per year.

GENERAL ALLEGATIONS

21. Plaintiff's achievements caused jealousy and became a sore point in the management world of Stryker.

22. At the National Sales Meeting in Arizona on or about January 7th or 8th, 2013, Plaintiff's then supervisor Erick Turner pulled Plaintiff aside and directed Plaintiff to nominate Craig Noble off the Executive Representative Council (ERC). The ERC is a prestigious counsel of seasoned sales rep at Stryker and carries influence over management decisions. Craig Noble was a seasoned and senior sales representative in the West Region which was managed by Plaintiff; Noble was Plaintiff's only rep on the ERC. Noble was a skeptic and critic of Erick Turner and Turner's supervisor Jim Brusseau who was the General Manager of Stryker.

23. Plaintiff did not wish to remove Craig Noble from the ERC. As a new manager, Plaintiff appreciated and needed Craig Noble's performance and influence.

24. Bowing to Erick Turner's pressure, Craig Noble was nominated off the ERC. Eric Turner said to Plaintiff, "otta boy, that's why I love you man."

25. On January 9, 2013, Erick Turner called Plaintiff asking whether Plaintiff had delivered

the news to Craig Noble regarding removal from ERC. Plaintiff indicated that he would wait until after the conclusion of the National Sales Meeting as not to affect the team's mood. Erick Turner demanded and directed Plaintiff to inform Craig Noble right away and stated that it was a direct order from Jim Brusseau.

26. In May 2013, during the first town hall meeting of sales representatives with the newly appointed General Manager Brent Ladd, Craig Noble complained publicly about his removal from the ERC and the role of Jim Brusseau and Erick Turner in the removal. Thereafter, an internal compliance investigation into the removal of Craig Noble from ERC was conducted.

27. After the May 2013 incident at the town hall meeting, Erick Turner called Plaintiff repeatedly over the next month, berating, falsely accusing, and harassing Plaintiff for "setting him up" at the townhall meeting and not backing Turner and Brusseau, baiting Plaintiff to say that Plaintiff hates Turner and Brusseau and Stryker, and pressuring Plaintiff to take the blame for removal of Craig Noble from the ERC.

28. Plaintiff would not give in to the pressure from management. Plaintiff refused to lie and cover up the truth beyond the removal of Craig Noble from the ERC.

29. After one of the repeated harassment calls in June 2013, Plaintiff called Shaelie Lambrath, the Human Resources Manager, who is Caucasian, to seek professional advice and counsel on dealing with the harassment by upper management. The Human Resources Manager assured the confidentiality of the phone call. However, an hour after the call between Plaintiff and the Human Resources Manager ended, Erick Turner called and belittled Plaintiff for calling the Human Resources Manager and talking trash about Turner. Turner stated to Plaintiff that he fires or demotes people that he can't trust and that he doesn't trust Plaintiff.

30. On or about August 13, 2013, Plaintiff informed by Brent Ladd and Erick Turner in a

meeting in Denver, Colorado, that Plaintiff was not a fit with Stryker and given four months to find another job.  Plaintiff was then pressured to sign a behavioral letter forbidding him to comment negatively about any person.  Plaintiff was not given the opportunity to review the document with independent counsel, argue against it, or confront any evidence or basis for the behavioral letter or not being a fit.  Plaintiff was threatened with termination if he did not sign the behavioral letter.

31. No other manager or employee of Plaintiff's race, position, or background were asked to sign similar "behavioral letter".  Plaintiff was under duress when he signed the behavioral letter.  Plaintiff was targeted because of his race and minority status and challenge to the Caucasian management.

32. Plaintiff sought to understand the circumstances leading to his forced signing of "behavioral letter" by reaching out to Brent Ladd, the General Manager.  After doing so, Plaintiff was contacted by Stryker's legal department threatening immediate termination if he sought to discuss anything about the events described above to anyone.   Plaintiff again argued his innocence, protested against the wrongful threat, and identified witness who can corroborate the truth regarding removal of Craig Noble from the ERC.

33. In November 2013, Brent Ladd informed Plaintiff that Plaintiff would remain as the Regional Manager and wouldn't need to look for a new job.

34. Plaintiff was not informed of the result of the internal investigation into the removal of Noble from the ERC.  However, based on the announcement by Ladd referenced in paragraph 33 and the re-assignment of other employees, Plaintiff was vindicated; however, Stryker took no actions to apologize, correct, or prevent future harassment against Plaintiff.  Instead, Stryker sought to silence Plaintiff with threat of termination.

35. Plaintiff sought to communicate with Director of Human Resources pertaining to the

circumstance and situations described above but were rebuffed by Stryker from doing so.

36. Instead, Stryker sought to terminate Plaintiff because he did not "fit with their culture" – Plaintiff was Latino, minority, respect and abide by ethics code and rules, independent minded, and unwilling to cover up and lie about violations.

37. On or about December 13, 2014, Plaintiff's manager, Eric Masingale and then H.R. Manager, Erik Berg, asked to meet with Plaintiff without any hint or basis of need. On December 16, 2014, Plaintiff met with Masingale and Berg during which time Stryker accused Plaintiff of operating an outside business in competition with Stryker, recruiting Stryker employees, and seeking to solicit Stryker customers. Masingale and Berg stated that, on December 8, 2014, a customer left a message on Ethics Hotline accusing Plaintiff of the aforementioned acts.

38. To date, Stryker has not and refused to provide evidence supporting its accusations and alleged legal basis for terminating Plaintiff. Stryker merely states to Plaintiff that it has text messages and voice recordings.

39. On information and belief, Mike Peters orchestrated the call pretending to be a customer of Stryker and making false accusations against Plaintiff. Mike Peters is a sales rep under Plaintiff's supervision. In late November or early December 2014, Plaintiff had informed Peters that Peter's sales territories were reduced which may affect his sales quota. Peters sent nasty text messages to Plaintiff in response to the reduction of sales quota which Plaintiff forwarded to Eric Masingale and Stryker.

40. Mike Peters is a Caucasian sales person. He was not investigated or disciplined by Stryker for behavioral issues arising from his nasty text massages. Peters was not asked or required to sign a behavioral letter.

41. Erick Turner and Shaelie Lambrath are Caucasian employees and management

personnel.  Neither of them were disciplined or terminated for their harassing conduct or breach of personnel policy and confidentiality. Instead, both were reassigned and promoted to other divisions of Stryker.

42. Eric Masingale and Erik Berg are Caucasian employees and management personnel. Neither of them were investigated, disciplined, or terminated, for failing to observe due process and personnel policy for employment sanctions and termination.

43.  Jim Brusseau is Caucasian upper management personnel.  He was not investigated, disciplined, or terminated for ordering removal of employee from ERC and allowing harassment against Plaintiff.

44. Plaintiff was replaced by Alex Debrucky, a Caucasian sales representative.  Based on information and belief, Debrucky owns and operates an outside business in competition with Stryker but was not investigated, disciplined, or terminated by Stryker.

45. The conduct by Stryker and the above named personnel to harass, belittle, terminate, and violate the rights of Plaintiff was outrageous, wanton, and malicious.

### COUNT ONE
**(Wrongful Termination In Violation of Public Policy)**
**[against All Defendants]**

46. Plaintiffs incorporate by reference the averments of paragraphs 1 through 45 above as if fully set forth herein.

47. Plaintiff entered into an employment relationship with Defendant Stryker.

48. As a result of the above activities, Stryker terminated and discharged Plaintiff from his employment in violation of public policy.

49. Stryker's basis for terminating Plaintiff were pre-textual, lacked legal basis or evidentiary support, violated Mr. Duarte rights, and breached Stryker's internal code and practices.

- 9 -
COMPLAINT

50. Stryker terminated Plaintiff based on his race and minority status, in violation of, inter alia, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 et seq., and California Government Code § 12940 et seq.

51. Stryker terminated Plaintiff based on his unwillingness to lie, to conform to the White management culture, and to cover up for the misconduct or non-compliance of his superiors.

52. Stryker's conduct also violated Federal and State laws, including but not limited to California Penal Code § 632 (recording confidential communications), 18 U.S.C. § 2511 (interception and disclosure of oral communications), and Article I, section 1 of the California Constitution (privacy initiative).

53. As a direct and proximate result of the misconduct and unlawfulness of Defendant Stryker and the resulting termination and adverse employment action, as set forth above, Plaintiff sustained severe and serious injuries and damages, including but not limited to lost wages and compensation, in a sum to be shown according to proof.

54. Defendant Stryker's conduct was a substantial factor in causing harm to Plaintiff's occupation, mental anguish, embarrassment, and humiliation, and exposed Plaintiff to hatred, contempt, ridicule, shame, and discouraged others in the industry from associating or dealing with him.

55. Defendant Stryker's act and omission described above were done with an intent to cause injury to Plaintiff. As a consequence of the aforesaid oppressive, malicious, and despicable conduct, Plaintiff is entitled to an award of punitive damages against Defendant Stryker in a sum to be shown according to proof.

///

///

## COUNT TWO
### (Harassment and Hostile Work Environment)
### [against All Defendants]

56. Plaintiff incorporate by reference the allegations contained in paragraphs 1 through 55 above as though fully set forth herein.

57. As an employee, Plaintiff is entitled to protections provided by Title VII of the Civil Rights Act of 1964, 42 U.S.C. section 2000 et seq, and California Government Code § 12940 et seq.

58. Defendant Stryker violated the above-stated laws by discharging and discriminating Plaintiff because of his race, color, and national origin.

59. Defendant Stryker's conduct and omissions, in creating and permitting its management and employees to harass and violate the rights of Plaintiff based on Plaintiff's race, color, and national origin, unreasonably interfered with Plaintiff's work environment and created an intimidating, hostile, or offensive work environment.

60. As a result of defendant Stryker's participation, knowledge, and/or permission of the above described misconduct and omissions, Plaintiff has been harmed to his person, employment and income, and reputation, in amount to be determined according to proof at trial.

## COUNT THREE
### (Breach of Employment Contact)
### [against All Defendants]

61. Plaintiff incorporate by reference the allegations contained in paragraphs 1 through 60 above as though fully set forth herein.

62. Plaintiff entered into an employment contract with Defendant Stryker that did not specify the term of the employment.

63. Defendant Stryker were subject to obligations, both express and implied, not to discharge Plaintiff, except for just or good cause.

64. Defendant Stryker were subject to obligations, both express and implied, to comply and enforce employment laws and Stryker ethics, codes, and policies, and to provide a positive work environment.

65. As a Manager, Plaintiff had an implied employment contract with Defendant Stryker which provides that Plaintiff will be employed at Stryker for as long as he performs satisfactorily.

66. At all times relevant herein, Plaintiff adequately performed their job duties and achieved high performance evaluations, including exceeding and breaking company quotas and records.

67. Defendant Stryker breached the employment contract by constructively and actually terminating Plaintiff without good cause, where such adverse employment action was not based on fair and honest cause or reason, and was not taken in good faith.

68. Defendant Stryker breached employment contract by intentionally creating and permitting a hostile work environment and enabling Stryker managers and employees to harass Plaintiff.

69. Defendant Stryker breached employment contract by coercing Plaintiff to sign "behavioral letter" and non-compete documents under false pretenses, without opportunity of review or independent counsel, in order to silence Plaintiff from reporting violation and non-compliance of company rules, ethics, and policies.

70. As a result, Plaintiff was harmed by the termination in an amount to be proved at the time of trial.

## COUNT FOUR
### (Breach of Implied Covenant of Good Faith and Fair Dealing)
### [against All Defendants]

71. Plaintiff incorporate by reference the allegations contained in paragraphs 1 through 70 above as though fully set forth herein.

72. Plaintiff entered into an employment relationship with Defendant Stryker.

73. A covenant of good faith and fair dealing is implied in every employment contract.

74. Plaintiff substantially perform his job duties. Plaintiff received positive and excellent performance evaluations and garnered multiple work accolades.

75. Defendant Stryker deprived Plaintiff of his occupation and employment at Stryker when it wrongfully discharged Plaintiff under false pretenses and without any due process or evidentiary support.

76. Defendant Stryker improperly and constructively sanctioned Plaintiff without justification by forcing Plaintiff to sign "behavioral letter" and restrictive covenants under duress, coercion, and false pretenses.

77. Defendant Stryker terminated Plaintiff, under false pretense, less than ten days before end of the year 2014 to avoid paying Plaintiff his just and earned compensation, including but not limited to performance bonuses.

78. As a direct and proximate result of the misconduct and unlawfulness of Defendant Stryker, and the resulting termination and adverse employment action, as set forth above, Plaintiff sustained severe and serious injury to him personally, including loss of benefits under the employment contract, all to Plaintiff's damage in a sum to be shown according to proof.

79. Such conduct by Defendant Stryker was a substantial factor in causing harm to the Plaintiff's occupation, humiliation, embarrassment, and mental anguish, and exposed Plaintiff to harassment, contempt, ridicule, stress, and discouraged others in the industry from associating or dealing with him.

///

///

///

## COUNT FIVE
### (Intentional Infliction of Emotional Distress)
### [against All Defendants]

80. Plaintiff incorporate by reference the allegations contained in paragraphs 1 through 79 above as though fully set forth herein.

81. Defendant Stryker's conduct and omissions, through its management, employees, and hostile work environment, in harassing, belittling, and threatening termination of Plaintiff if he did not lie and conceal the truth about non-compliance and work place violations was outrageous. Defendant Stryker's conduct and omissions, through its management, employees, and hostile work environment, to suppress and coerce Plaintiff from speaking up and inquire into the workplace environment was outrageous.

82. Defendant Stryker's conduct and omissions, through its management, employees, and hostile work environment, in disclosing private and confidential conversation regarding request for human resource assistance and enabling further harassment, coercion and suppression of Plaintiff was outrageous.

83. Defendant Stryker's conduct and omissions, through its management and employees, in forcing Plaintiff, under threat of termination and unwarranted disciplinary action, to sign documents which deprived him of his right of speech and employment rights was outrageous.

84. Defendant Stryker's conduct and omissions, in terminating Plaintiff under false pretenses in violation of public policy and without conduct of any real investigation of its allegations was outrageous.

85. Defendant Stryker's conduct and omissions, in terminating Plaintiff for the true reason that Plaintiff was Latino and minority and did not conform to the White culture (even if it required him to lie, conceal the truth, and violate corporate policies and laws) was outrageous.

86. Defendant Stryker's outrageous conduct and omission was intentional and directed at Plaintiff.

87. Defendant Stryker' intended to cause Plaintiff emotion distress and/or acted with reckless disregard of the probability that Plaintiff would suffer emotional distress.

88. As a result of such conduct and omission, Plaintiff suffered severe emotional distress, including mental anguish, humiliation, embarrassment, harassment and deprivation of dignity associated with the loss of one's life work, employment opportunity and compensation, and smearing of reputation in the industry, all to Plaintiff's damage in a sum to be shown according to proof.

89. Defendant Stryker's conduct and omissions were a substantial factor in causing Plaintiff's emotional distress.

## COUNT SIX
### (Negligent Infliction of Emotional Distress)
### [against All Defendants]

90. Plaintiff incorporate by reference the allegations contained in paragraphs 1 through 89 above as though fully set forth herein.

91. Defendant Stryker owed Plaintiff a duty of care not to permit the above described actions, including but not limited to the wrongful termination and harassment to which Plaintiff was subjected.

92. Defendant Stryker knew, or should have known, that its failure to exercise due care in its actions would cause Plaintiff severe emotion distress.

93. As a direct, legal, and proximate result of Defendant Stryker's aforesaid actions and omissions, Plaintiff suffered severe emotional distress, including mental anguish, humiliation, embarrassment, harassment and deprivation of dignity associated with the loss of one's life work,

- 15 -
COMPLAINT

employment opportunity and compensation, and smearing of reputation in the industry, all to Plaintiff's damage in a sum to be shown according to proof.

94. Defendant Stryker's conduct and omissions were a substantial factor in causing Plaintiff's emotional distress.

**WHEREFORE**, Plaintiff respectfully prays for the following relief in an amount in excess of $75,000:

1. Compensatory damages according to proof at trial, including loss of salary and wages, benefits, performance bonuses, and compensations;

2. Damages for mental and emotion distress according to proof at trial;

3. Punitive damages according to proof at trial;

4. Interest and costs allowed by law;

5. Attorney's fees; and

6. Such other and further relief as the Court may deem fair, just, and equitable.

DATED: January 4, 2016

LAW OFFICES OF PETER C. CHEN

PETER C. CHEN, Esq.
Attorney for Plaintiff

- 16 -
COMPLAINT